# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>YANCARLOS ABRANTE a/k/a "Glizzy,"<br>JOSHUA ESTRADA a/k/a "Mac,"<br>JASON JOHNSON-RIVERA a/k/a<br>"Ouda" | No. 2:24-mj-139-KFW |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Ryan P. Hatch, being first duly sworn, hereby depose and state as follows:

### AGENT BACKGROUND AND INTRODUCTION

1. I am a Detective with the Saco Police Department in Saco, Maine, and a graduate of the Maine Criminal Justice Academy. I have been a Detective for the past eight years and during that time I was assigned as Special Agent with the Maine Drug Enforcement Agency from March of 2015 to April 5, 2019. I am currently assigned as a general Detective investigating serious felony crimes to include violent crimes and serious property crimes as well as other violations of Maine Criminal Law.

2. As of October 2022, I have been assigned as a Task Force Officer ("TFO") for the Federal Bureau of Investigation Safe Streets Task Force/ Southern Maine Gang Task Force. The task force focuses on drug trafficking, gun crimes, and other violence involving organized crime.

3. As detailed further below, there is probable cause to believe that the defendants have committed federal crimes, including conspiring to distribute controlled substances, in violation of Title 21, United States Code, Sections 846 and 841(a)(1), and perpetrating a drive-by shooting, in violation of Title 18, United States Code, Section 36.

This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested arrest warrant.

## PROBABLE CAUSE

**A. The Defendants Are Drug Dealers Operating in Saco Biddeford**

4. I am informed by a cooperating witness ("CW-1")[1] whom I know to be a drug user, that beginning in or about January 2024, CW-1 purchased cocaine between 10 and 15 times through a Facebook page known to me. In summary, according to CW-1, when CW-1 sought to purchase cocaine, CW-1 would contact the users of the Facebook page on Facebook Instant Messenger requesting a quantity of drugs and meeting location. Thereafter, CW-1 would meet with the individuals CW-1 understood to run the Facebook page. CW-1 never learned the true names or street names of these individuals, but CW-1 was able to positively identify photographs of these individuals shown to CW-1 by law enforcement. The individuals CW-1 identified are defendants YANCARLOS ABRANTE a/k/a "Glizzy," and JOSHUA ESTRADA, a/k/a "Mac." CW-1 further informed me that on each occasion when CW-1 purchased cocaine from the defendants, CW-1 received a half to a full gram of cocaine for approximately $100 per gram. CW-1 recalled that a third individual was present during some of these encounters. This third individual wore a mask and had a walking boot on one of his feet.

5. CW-1 further informed me that on about February 7, 2024, CW-1 arranged to purchase additional cocaine through the Facebook account. Rather than paying cash,

---

[1] CW-1 is a known drug user who favors cocaine. CW-1 has a criminal history to include the distribution of narcotics, misdemeanor assault, stalking, and carrying a concealed weapon. CW-1's information has been deemed to be reliable, and has been corroborated by, among other things, surveillance, business records, cellular telephone records, and information provided by additional witnesses as described further below.

CW-1 was asked to rent a hotel room for ABRANTE, ESTRADA and the third masked individual, later identified by law enforcement as defendant JASON JOHNSON-RIVERA, a/k/a "Ouda," as described further below. CW-1 rented the defendants a room at a Portland-area hotel known to me (the "Hotel").

6. I have reviewed records provided by the Hotel relating to the defendants' stay on or about February 7, 2024, from which I have learned that CW-1 is listed as the room's registered guest. I have reviewed images captured from the Hotel's security cameras from on about February 7, 2024, and I was able to positively identify defendants ABRANTE, ESTRADA, and JOHNSON-RIVERA on the premises of the Hotel. The images also show the defendants in and around a green Honda HR-V which appeared identical to the vehicle used by the defendants in a drive-by shooting on February 9, 2024, described further below.

7. I have reviewed photographs, videos, and communications recovered from the cellular telephones of ABRANTE and JOHNSON-RIVERA demonstrating that ABRANTE, ESTRADA, and JOHNSON-RIVERA were drug dealers, including the following:

   a. I have reviewed videos and images created on about February 8, 2024, depicting ABRANTE dancing on the tabletop of his room in the Hotel, holding a fan of U.S. currency, and showing a handgun at ABRANTE's feet (circled in red in the

first image); as well as an image depicting a bag of what appears to be cocaine base:



b.   I have reviewed videos created on about February 8, 2024 depicting JOHNSON-RIVERA riding in a vehicle, smoking what is believed to be a marijuana cigarette, holding a handgun in his lap. A second video depicts JOHNSON-RIVERA pointing the handgun at the camera:



c. I have reviewed a video created on about February 8, 2024, depicting ESTRADA in a vehicle pointing a handgun at the camera while smoking what appears to be a marijuana cigarette, and a video created on about February 2, 2024, depicting ESTRADA fanning out a quantity of U.S. currency:



d. I have reviewed a Snapchat conversation that occurred on about January 15, 2024, between ABRANTE and a second Snapchat user known to me ("CC-1"), during which, CC-1[2] sought to purchase drugs from ABRANTE. CC-1 wrote, "Yeoo u still vot them 10gs for 300[?]"[3] to which ABRANTE responded, "Jus got rid of it bro[.]"

---

[2] CC-1 was arrested by Saco Police Department officers on April 15, 2024, in possession of 6.1 grams of methamphetamine and a Smith and Wesson 380 caliber handgun. I was able to identify CC-1 as the same individual in contact with ABRANTE based upon subscriber records provided by Snapchat.

[3] Throughout, all grammar, spelling and similar errors are reproduced from the original messages.

ABRANTE later wrote, "Im boutta re up[.] Ima hyu when I get back[.]" CC-1 responded, "Yea ny dude comin up today as well[.] But ill let you kno[.]"

    e. I believe, based upon my training and experience, that the conversation summarized above is drug related. When CC-1 wrote ABRANTE and asked if he still had "10gs for 300," I believe that CC-1 was seeking to purchase ten grams of narcotics for $300. ABRANTE then informed CC-1 that he had already sold that amount, but that he was about to "re up" (i.e., to resupply) meaning that he would have additional narcotics available for purchase in short order.

    f. I have reviewed a text message conversation that occurred on about January 30, 2024 between JOHNSON-RIVERA and another coconspirator ("CC-2"), during which JOHNSON-RIVERA discusses his drug holdings and debts, among other topics. JOHNSON-RIVERA wrote, "I only got like 2 bands and another zip and s lil sum[.]" CC-2 responded, "Idc about to money bro care about ya safety these nigga just keep reacting off anger not good[.]" JOHNSON-RIVERA responded, "I'm hip it's I gotta clear my shit wit you to Tho[.] I'm sturdy[.] Yk if it came down to it I'll get out of here[.] Got bread for a Uber if I need to[.]" CC-2 responded, "I love you bro don't hesitate to call if u feel weird[.]"

    g. I believe based on my training and experience that the conversation summarized above is drug related. For example, when JOHNSON-RIVERA wrote that he had "2 bands" and another "zip," he was referring to two thousand dollars in U.S. currency, and an ounce of narcotics. When JOHNSON-RIVERA wrote that he had to "clear [his] shit" with CC-2, he was referring to settling up a drug debt to CC-2. It is also evident from the content of the conversation that JOHNSON-RIVERA is concerned for his safety because his associates "keep reacting off anger."

6

h.  I have reviewed a text message conversation that occurred on about January 5, 2024, between JOHNSON-RIVERA and another coconspirator ("CC-3"), during which JOHNSON-RIVERA stated that he intended to sell narcotics to an individual he identified as "Nino." Specifically, JOHNSON-RIVERA wrote, "Idc if you would've talked to me abt why I wanted to go see Nino you would've found out that I'm going to sell him a zip for 700 but nah everything I do is not good wit you." CC-3 replied, "Idgaf u asked me then proceeded to tell me you was going anway[.]" JOHNSON-RIVERA later wrote, "Ight your just a kid you don't see the bigger point but ight[.] I was going out there to make a play[.]" Based on my training and experience, and based on the price per ounce discussed, I believe that this conversation relates to either fentanyl, methamphetamine, or cocaine.

**B. CC-4 is a Drug Dealer Operating in Saco Biddeford**

8.  I have reviewed the content of a cellular phone seized from a coconspirator of the defendants known to me ("CC-4"), from which I learned that CC-4 was also a drug dealer operating in the Saco Biddeford area who dealt kilogram quantities of cocaine from at least January 2024. The following are examples of information contained on the cellular phone:

a.  I have reviewed a Snapchat conversation between CC-4 and a coconspirator ("CC-5") that took place starting on about April 3, 2024, during which CC-5 arranged to purchase seven ounces of narcotics from CC-4. CC-5 asked, "When we link I need 5 soft 2 hard if possible no sweat if not 7 total 5250?" CC-5 then writes, "when back" several days later. I believe, based on my training and experience, that this conversation related to the purchase of both powder and crack cocaine. When CC-5

sought "5 soft" he meant five ounces of powder cocaine, and when he sought "2 hard," he meant 2 ounces of crack cocaine.

    b. I have reviewed a Snapchat conversation between CC-4 and a coconspirator ("CC-6") that took place on about April 7, 2024, during which CC-4 asks a customer of his "how that last stuff go gang[?]" CC-6 responded, "Straight grease balll bro all my ppl mess with it this batch moving quick quick glooks[.]" I believe, based on my training and experience, that CC-4 was asking CC-6 whether the narcotics CC-4 had sold to CC-6 were selling well. When CC-6 responded "straight grease balll," I believe CC-6 meant that the drugs were selling quickly.

    c. I have reviewed images and videos recovered from the cellular phone of CC-4 which depict large quantities of what I believe to be powder cocaine and fentanyl pills. For example, the images reproduced below show "brick" or kilogram quantities of cocaine as well as two bags full of pills that purport to be Oxycontin pills, but are likely illicit fentanyl pills:



### C. The Defendants and CC-4 Fought to Control the Flow of Drugs to Saco Biddeford

9. Based upon my review of electronic communications between CC-4 and ABRANTE, which I recovered from ABRANTE's cellular phone, I have learned that CC-4 was locked in a serious drug dispute with ABRANTE, ESTRADA, and JOHNSON-RIVERA. For example, I reviewed the following Snapchat exchange between CC-4 and ABRANTE which began on about January 29, 2024:

| CC-4 | ABRANTE |
|---|---|
| It wasn't you but it was your nighas | |
| You know who it was I don't beef with no one but Mac n Esco | |
| it cool tho bro I don't do no one wrong I bless people that's why I'm blessed | |
| n will stay blessed | |

9

|  | Bro stop calling niggas saying weird shit |
|---|---|
|  | Nbs |
|  | Trynna make it seem like we started everything lol |
| Nigha stfu it's josh |  |
| And u said u could get my water shut off |  |
| U sayin we can't go new b |  |
| You nighas the ones that started all this |  |
| And everyone know it y'all don't do a quarter of what I do |  |
| Even pillz n his girl tellin them nighas don't let these lil ass nighas play wit this nigha |  |
| Only thing I told them is I'm not grabbing a brick of raw when I'm into it wit nighas I want all my bread for war jus incase I gotta pay wild nails again lol |  |
| y'all tried telling them I tried y'all and I stole y'all plays bitch y'all bust little tiny plays of dog my nigha |  |

10.     I believe that the Snapchat conversation summarized above shows that CC-4 and ABRANTE were rival drug dealers in a dispute about who controlled certain drug territory/customers in Saco Biddeford. I believe that when CC-4 referenced "Mac," he meant JOSHUA ESTRADA, whose street name is Mac. CC-4 indicated that it was Mac with whom he had conflict, and that "Josh" is the one who stared this conflict. I understand "Josh" to be JOSHUA ESTRADA. ABRANTE acknowledged the conflict between CC-4 and the defendants, but disputed that the defendants "started everything." When CC-4 stated that ABRANTE said he "could get my water shut off,"

and referenced "new b," I believe that CC-4 meant that ABRANTE could use his influence to stop his suppliers in New Bedford from selling narcotics to CC-4, which would ultimately put CC-4 out of business. When CC-4 stated that ABRANTE did not "do a quarter of what I do," CC-4 meant that CC-4 sold more drugs than ABRANTE. When CC-4 stated, "[o]nly thing I told them is I'm not grabbing a brick of raw when I'm into it wit nighas I want all my bread for war jus incase I gotta pay wild nails again lol," I believe that CC-4 meant that CC-4 was not planning to buy a kilogram of pure narcotics at this time, because he needed to reserve cash in case he needed to marshal it in his conflict with ABRANTE.

11. I have reviewed a Snapchat conversation that took place on about January 31, 2024, that was recovered from ABRANTE's cellular telephone between ABRANTE and another coconspirator who I know to be a close drug associate of CC-4 ("CC-7").

| CC-7 | ABRANTE |
|---|---|
| | You would never set foot in my hood |
| | My shottas will come extort you try it |
| Nigga was just out the them niggas show love you goofy | |
| | Bro are yu krazy |
| | I give that green light niggas will be on your wheels pussy |
| Do it it's on | |
| | Bro you realize you reing up off my ppl sources like niggas coulda been dead fr |
| You think we fuck with shan you stupid on dawgs | |

11

12. I believe that the Snapchat conversation summarized above shows that ABRANTE's drug dispute with CC-4 also involved CC-7. At the outset of the conversation, ABRANTE threatened CC-7 when he wrote that if CC-7 "set foot" in his neighborhood, that his "shottas" (meaning his armed criminal associates) would "extort" CC-7 (meaning rob CC-7 and not provide him with narcotics). CC-7 responded that CC-7 was just with ABRANTE's "shottas" and they "show[ed] love," meaning that they engaged in a fair drug transaction. ABRANTE stated that if he gave the "green light," that his criminal associates would be "on [CC-7's] wheels," meaning that they would hunt him down to do him harm. CC-7 stated, "do it, it's on" meaning that CC-7 was not afraid of ABRANTE's threats.

**D. The Defendants Attempted to Kill CC-4 and CC-7**

13. I know from my review of Saco Police Department records that on about February 9, 2024, at approximately 11:56 a.m., police received a report of five to six shots fired between a black car and an orange Charger at the intersection of Temple Street and Elm Street in Saco. At 11:57 a.m., police received an automated report of a crash detected in the vicinity of North Street and Elm Streets in Saco, several blocks north of the original report of shot fired.

14. I responded to the scene of the shooting and began my investigation. During the course of my investigation, I located one bullet projectile and four 9 mm shell casings at the scene, as well as broken glass. I then proceeded to the intersection of North Street and Elm Street where I observed a heavily damaged green Honda HR-V bearing New Hampshire registration 5154753. It appeared that the HR-V had crashed into another passenger vehicle and a school bus. I and other members of law

enforcement then proceeded to canvas the area looking for suspects, and also seeking to retrieve video of the event which precipitated the crash.

15. Ultimately, I recovered video of the incident from a number of sources, which I have reviewed, and I interviewed a number of eyewitnesses to the incident, from which I have learned the following:

    a. Video recordings depict a red Charger bearing Maine registration 7120ZM, which was later determined to be an Enterprise rental car, traveling north on Elm Street and stopping in the left turn only lane at the intersection of Elm and Temple Streets. The HR-V is then depicted pulling up along the passenger side of the Charger before multiple gunshots are heard being fired. As described further below, the Charger was ultimately recovered with five bullet holes in its passenger's side.

    b. An eyewitness to the shooting, whose vehicle was positioned so as to see the Charger and HR-V, informed me that he observed a gun being fired from the rear driver's side window of the HR-V. After the shots were fired, the HR-V took off and the eyewitness was able to hear additional shots being fired.

    c. Dashcam video of a private citizen shows the HR-V speeding through the intersection of Elm Street and North Street through a red light and against traffic, ultimately crashing into a passenger vehicle and then careening into a school bus stopped at the intersection. That same video depicts the red Charger pulling up to the intersection, where an individual (later determined to be CC-7) can be seen brandishing a handgun. The rear passenger window of the red Charger can be seen to be shattered. The dashcam video further shows that immediately after the crash, a black male exits from the rear driver's side door of the HR-V and runs into a residential yard.

d. A high school aged student who was riding on the bus when it was struck by the HR-V captured images of the occupants of the HR-V with a cellular phone. I have reviewed those images, from which I was able to positively identify ESTRADA and ABRANTE with the assistance of New Bedford law enforcement. The third individual was not identifiable from the student photographs, but was later identified as JOHNSON-RIVERA. Specifically, I reviewed video footage taken from the Maine Mall on February 8, 2024, which shows ABRANTE, ESTRADA, and JOHNSON-RIVERA shopping together. Their faces are all clearly recognizable from the video, and they were wearing the same clothing as they wore the following day, as captured by the student photographs.

16. I searched the HR-V pursuant to a judicially authorized warrant, from which I recovered a Smith and Wesson M&P Shield 9 mm handgun, two cellular phones (later identified as belonging to JOHNSON-RIVERA and ABRANTE), a digital scale coated with a white powder residue that tested presumptively positive for cocaine base, ammunition (including the same brand of shells as the casings found at the scene), and a medical boot.[4] ATF conducted a firearms trace of the handgun recovered from the HR-V, and was able to determine that it was purchased in 2015 in Hotchkiss, Colorado by an individual unrelated to this investigation.

17. I later extracted information from ABRANTE's and JOHNSON-RIVERA's cellular phones pursuant to judicially authorized warrants, some of which is detailed

---

[4] I have learned from New Bedford-area law enforcement partners that JOHNSON-RIVERA suffered from a previous (self-inflicted) gunshot wound to his leg and was wearing a walking boot as a result of that injury. It should be noted that CW-1 also related the presence of a boot on the third individual he could not otherwise positively identify to law enforcement.

above. From my review, I also learned that location monitoring services were enabled on JOHNSON-RIVERA's cellular phone. That information shows that JOHNSON-RIVERA's cellular phone was present at the Hotel on February 7, 2024, at the Maine Mall on February 8, 2024, and at the scene of the shooting on February 9, 2024, among other locations relevant to this investigation.

18. Using information provided by Enterprise Rent-a-Car relating to the Charger, law enforcement officers were able to obtain location information of the Charger from AT&T. Those records, which provided the location of the Charger at 15-minute intervals, showed that the Charger was present at an address in Standish. Law enforcement officers conducted a canvas of the area around the Standish address on February 9, 2024, and ultimately located the Charger at an address on Ossipee Trail in Standish that same evening. The Charger had five bullet impacts along the passenger side. I later conducted a search of the Charger pursuant to a judicially authorized warrant, from which I recovered a credit collection services notice to CC-4 listing CC-4's true name and home address. I was also able to remove two bullet projectiles from the vehicle.

19. Law enforcement conducted a consensual interview of a cooperating witness ("CW-2"), the owner of the address where the Charger was found. Based on that interview, I learned that CC-4 drove the Charger to CW-2's address on February 9th. CC-4 was accompanied by a black male who CW-2 did not know (believed by law enforcement to be CC-7). CC-4 informed CW-2 that CC-4 needed to get work done on the Charger, and asked CW-2 if CC-4 could leave the Charger at CW-2's house for a period of time. CW-2 agreed, and provided CC-4 with a tarp to cover the Charger at CC-

4's request. CC-4 and the black male were later picked up at CW-2's house by a black Camaro.

E. Conclusion

20. Based on the foregoing, I respectfully request that the Court issue the attached Criminal Complaint, charging the defendants YANCARLOS ABRANTE a/k/a "Glizzy," JOSHUA ESTRADA, a/k/a "Mac," and JASON JOHNSON-RIVERA, a/k/a "Ouda," with conspiring to distribute controlled substances in violation of Title 21, United States Code, Sections 846 and 841(a)(1), and with perpetrating a drive-by shooting, in violation of Title 18, United States Code, Section 36.

Ryan P. Hatch
Task Force Officer
Federal Bureau of Investigation

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedures

Date: May 02 2024

City and state: Portland, Maine

Judge's signature

Karen Frink Wolf, U.S. Magistrate Judge
Printed name and title