**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No. 2:24-cr-00057-LEW-2** |
| | ) | |
| **JOSHUA ESTRADA** | ) | |

**DEFENDANT ESTRADA'S MOTION TO COMPEL TO COMPEL DISCLOSURE OF BRADY, GIGLIO AND RELATED DISCOVERABLE MATERIAL**

The Defendant, Joshua Estrada, by and through counsel Amy L. Fairfield, respectfully moves this Court for an order compelling the Government to disclose all *Brady* and/or *Giglio* materials, that is favorable, exculpatory, impeachment, mitigating, or otherwise discoverable information learned or developed by the prosecution in connection with its preparation for trial of co-defendant Jason Johnson-Rivera. This Motion arises from representations made by the Government itself during Johnson-Rivera's sentencing proceeding establishing that, while preparing his case for trial, the prosecution discovered previously unidentified "vulnerabilities," "issues," and "new information" concerning the prosecution. Defendant Estrada makes this request pursuant to the United States Constitution, the Due Process Protection Act, and Rule 5(f) of the Federal Rules of Criminal Procedure, and further states as follows:

The defense does not presently know the substance of that information. Estrada and Johnson-Rivera were prosecuted in the same case, based upon the same alleged conspiracy, the same February 9, 2024, shooting, substantially the same witnesses, physical evidence, electronic evidence, surveillance evidence, and investigative history. Estrada entered guilty pleas before the Government completed the trial preparation that caused these matters to become evident. The

Government thereafter disclosed in open court that trial preparation revealed information affecting its assessment of the Johnson-Rivera prosecution, but that information has not, to the defense's knowledge, been disclosed to Estrada.

Because evidence favorable to an accused must be disclosed not merely when it proves actual innocence, but also when it bears upon culpability, intent, credibility, impeachment, punishment, or the reliability of the Government's proof, the Government should be required to disclose the information it learned during its preparation for Johnson-Rivera's trial. At minimum, if the Government contends the information is not subject to disclosure, the materials and a description of any non-memorialized information should be submitted to the Court for in-camera review.

## PROCEDURAL AND FACTUAL BACKGROUND

On May 2, 2024, Joshua Estrada was charged by criminal complaint with Conspiracy to Distribute Controlled Substances pursuant to 21 U.S.C. 841 (a) (1) and 841 (b)(1)(C) and Drive-by-Shooting in violation of 18 U.S.C § 36 (b) (1) & (2) (ECF No. 1). Estrada was arrested in Massachusetts on May 6, 2024, and thereafter removed to the District of Maine. On May 15, 2024, Estrada was indicted on two corresponding counts (ECF No. 14).

The prosecution subsequently expanded the charges. On March 19, 2025, a three-count superseding indictment charged Estrada with: (1) Conspiracy to Distribute Controlled Substances (Five Kilograms or More of a Substance Containing Cocaine) in violation of 21 U.S.C. §§; 841(a)(1), 841(b)(1)A), 846 (2) Drive-by Shooting and Aiding and Abetting in violation of 18 U.S.C. §§36(b)(1), 2; and (3) Use of a Firearm During and In Relation to a Drug-Trafficking Crime and Aiding and Abetting in violation of 18 U.S.C. §§ 924 (c)(1)(A), 924 (c)(1)(a)(iii), 2.

Estrada was arraigned on the superseding indictment on March 27, 2025, and entered pleas of not guilty (ECF No. 103).

Estrada was prosecuted jointly with Yancarlos Abrante and Jason Johnson-Rivera, as depicted in the Indictment and the Presentence Investigation Report.

The Government's account treats the three defendants as participants in a common drug-trafficking organization operating in the Saco/Biddeford area. According to the PSR, the Government contends that Estrada, Abrante, and Johnson-Rivera were engaged in a territorial dispute with Anthony Butler and Rodrigue Mucyo, culminating in the February 9, 2024, shooting that forms the basis of Counts Two and Three. (PSR ¶4).

Thus, this is not a circumstance in which information arose in the preparation of some unrelated prosecution. Johnson-Rivera was Estrada's charged co-defendant, and the Government prepared Johnson-Rivera for trial on the criminal enterprise for which Estrada had already entered guilty pleas.

The PSR identifies Estrada as the driver of the Honda HRV, Johnson-Rivera as the rear passenger, and Abrante as the front passenger (PSR ¶8). The Government's factual account further states that seven shots were fired from the HRV toward the Dodge Charger occupied by Butler and Mucyo and that the shooter was ultimately determined to be Johnson-Rivera (PSR ¶8).

The evidentiary basis for identifying Johnson-Rivera as the shooter included witness evidence and forensic evidence. The PSR states that a witness reported that the shots from the HRV came from the rear driver's side, where Johnson-Rivera was seated. It further reports that

Johnson-Rivera's DNA was found on the rear passenger door handle and on the trigger and grip of the firearm recovered from the HRV. Estrada's and Abrante's DNA was also found on the grip, and all three defendants' DNA was located on the magazine (PSR ¶17).

The Government also possessed other evidence tying Johnson-Rivera specifically to firearms. The PSR describes photographs showing Johnson-Rivera holding a gun, possessing a gun in his lap, smoking what appeared to be marijuana while holding a gun, and pointing a gun toward a camera (PSR ¶18).

Other Government-source evidence was likewise directed specifically at Johnson-Rivera's alleged propensity or willingness to act as a shooter. One confidential source reportedly told investigators that Johnson-Rivera had come to Maine only shortly before the shooting and that his nickname, "ootah," was pronounced like "shootah" without the initial consonant. The source further claimed Johnson-Rivera came to Maine because he was "not afraid to shoot,' (PSR ¶23).

Those allegations are potentially important to Estrada because they bear directly upon the prosecution's theory concerning planning, intent, relative responsibility, and whether the shooting was a collectively intended act or an act initiated by Johnson-Rivera.

On September 24, 2025, Estrada appeared before Chief Judge Walker and pleaded guilty to all three counts of the superseding indictment (ECF No. 115).

At the time Estrada entered his pleas, Johnson-Rivera's case had not yet proceeded to trial. Thus, the prosecution had not yet completed the trial preparation that later caused the Government to identify the matters giving rise to this Motion.

Estrada's pleas fixed his criminal liability before the Government undertook the intensive preparation associated with an imminent trial of the remaining co-defendant. It was during that later process—after Estrada had pleaded guilty—that the prosecution discovered information it described to the Court as "new information," "vulnerabilities," and "issues."

The Government has now revealed that, after Estrada pleaded guilty, its attorneys "drilled down" into trial preparation and interviewed witnesses in preparation for trial, and that this process exposed "vulnerabilities," "issues," and "litigation risk." Defendant Estrada is entitled to know whether those newly developed facts contradict, qualify, undermine, or impeach any of the evidence now being relied upon to determine his guilt, role, relevant conduct, or sentence.

Johnson-Rivera's case followed a markedly different path. At his May 28, 2026, sentencing, Chief Judge Walker recounted that Johnson-Rivera had been offered a plea arrangement, had initially rejected it, and appeared destined for trial. The Court observed that motions in limine had been fully briefed, a jury had been selected, and the parties were effectively on their way to trial when a later plea agreement was reached. It was during this preparation of the impending trial that caused additional "issues" to emerge.

ANALYSIS/ARGUMENT

*Brady v. Maryland*, 373 U.S. 83 (1963), holds that suppression of evidence favorable to an accused violates due process where the evidence is material to either guilt or punishment, irrespective of the prosecution's good or bad faith. *Id.* at 87. *Giglio v. United States*, 405 U.S. 150, 154–55 (1972), confirms that favorable evidence includes evidence bearing upon the credibility of Government witnesses.

The Government's obligation is not limited to evidence that conclusively proves innocence. Favorable evidence includes exculpatory and impeachment information. And the obligation is one belonging to the Government as a whole, not merely the individual prosecutor personally familiar with the information.

Rule 5(f), enacted through the Due Process Protections Act, requires federal courts to confirm the Government's disclosure obligations under *Brady* and its progeny and the consequences of noncompliance. The Court did precisely that here. The docket reflects an express May 16, 2024, Order reminding the Government of its obligation to disclose timely evidence favorable to Estrada or tending to cast doubt upon the Government's case. Federal courts implementing Rule 5(f) likewise recognize that the Government's obligation encompasses evidence favorable to the accused and that noncompliance may warrant significant sanctions.

Most importantly here, Estrada has not been sentenced. *Brady* expressly encompasses evidence material to punishment. *Id.* at 87, and this Court has yet to determine punishment.

During Johnson-Rivera's sentencing, the Court asked the Government to explain why Johnson-Rivera had received significantly more favorable treatment than his co-defendants. AUSA Falk responded: "What I can tell the Court is that as we were preparing for trial some things became evident to — to the trial team." The Government then explained that one thing it had come to believe was that Johnson-Rivera's culpability was less than that of the co-defendants. AUSA Falk represented that Johnson-Rivera had been in Maine only a matter of weeks, while the other defendants had been present much longer, and described the other defendants as "the brains of the operation," "the driving force with respect to the drug conspiracy," and the "shot callers" (Tr. Trans. 7).

But their relative culpability was not the only consideration identified by the Government. AUSA Falk expressly informed the Court that "there were other factors at play" that he did not wish to discuss in open court (Tr. Trans. 7 ). [1]

The Court seemingly recognized the potential significance of those undisclosed matters to Estrada and Abrante, but the Government has offered little else. In fact, in an attempt to discuss this further with the Government, AUSA Falk told Undersigned Counsel that the issues seemingly surrounded a potential witness in the case who the Government decided not to call as a witness. No other information was offered.

**WHEREFORE**, the Defendant respectfully requests that this Honorable Court enter an Order Compelling the Government to produce: All evidence and information obtained, developed, learned or confirmed during preparation for the anticipated trial of Jason Johnson-Rivera that is favorable to Defendant Estrada or material to guilt or punishment; all impeachment or *Giglio* information arising from interviews or investigation of Government witnesses or confidential sources; all information tending to undermine, qualify, contradict, or cast doubt on the factual allegations concerning Estrada's participation, intent, role, relevant conduct, drug quantity, firearm possession or use, the shooting, or relatively culpability; and all reports, notes, memoranda, recordings, communications, interview summaries, proffers, or other materials memorializing the "vulnerabilities," "issues," "litigation risk," or other factors identified by the Government at Johnson-Rivera's sentencing.

To the extent the Government contends that any responsive information should not be disclosed directly to the defense, Estrada requests that the Government be ordered to submit the

[1] I have attached a copy of the Jason Johnson-Rivera sentencing transcript for May 28, 2026.

information in camera for the Court's review, together with a basis for withholding it.

Estrada further respectfully requests that sentencing not proceed until the Government has complied with the Court's disclosure order and counsel has had a reasonable opportunity to review the material and determine whether relief—including a motion pursuant to Fed. R. Crim. P. 11(d)(2)(B)—is warranted.

Respectfully Submitted,

Dated: September 14, 2026

/s/ Amy L. Fairfield

Amy L. Fairfield, Esq.; Bar #9598
Counsel for Joshua Estrada
Fairfield and Associates, P.A.
10 Stoney Brook Lane
Lyman, ME 04002
Tel. (207) 985-9465
amy@fairfieldandassociates.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I filed the foregoing Defendant Estrada's Motion to Compel to Compel Disclosure of Brady, Giglio and Related Discoverable Material using the Court's CM/ECF system, which will cause a copy of the pleading to be served upon all counsel of record.

Dated: September 14, 2026

/s/ Amy L. Fairfield
Attorney for the Defendant

EXHIBIT A



UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

UNITED STATES OF AMERICA, Plaintiff

CRIMINAL ACTION

Docket No: 2:24-cr-00057-LEW-3

-versus-

JASON JOHNSON-RIVERA, Defendant

Transcript of Proceedings

Pursuant to notice, the above-entitled matter came on for **Sentencing** held before **THE HONORABLE LANCE E. WALKER**, United States District Court Judge, in the United States District Court, Edward T. Gignoux Courthouse, 156 Federal Street, Portland, Maine, on the 28th day of May, 2026 at 9:05 a.m., as follows:

Appearances:

For the Government: Noah Falk, Esquire
Johnathan Nathans, Esquire

For the Defendant: Robert A. Levine, Esquire

Also Present: Heather Belanger, U.S. Probation Officer

Tammy L. Martell, RMR, CRR
Official Court Reporter

(Prepared from manual stenography and computer-aided transcription)

(Open court. Defendant present.)

THE COURT: Good morning. We're here in the matter of United States versus Jason Johnson-Rivera. This is criminal case number 2:24-cr-57. I'll have counsel please introduce themselves for the record.

MR. FALK: Good morning, Your Honor, Noah Falk and Johnathan Nathans for the Government.

THE COURT: Good morning.

MR. FALK: Good morning.

MR. NATHANS: Good morning.

MR. LEVINE: Good morning, Your Honor, Robert Levine representing Jason Johnson-Rivera.

THE COURT: Good morning. Good morning, sir.

THE DEFENDANT: Good morning.

THE COURT: All right. The overall purpose, of course, sir, is for me to sentence you this morning based on your conviction. To that end, I'll hear from the lawyers and from you, if you wish, and from anyone else who the lawyers wish to present to the Court.

I'm going to be asking you and the lawyers some questions along the way, and the reason that I do that is to make sure that you've read and that you understand the revised presentence report. I want to be sure also that there is nothing that interferes with your ability to understand what's happening here today. And maybe most importantly I want to be

sure that by the time we reach the end of the hearing that you understand the sentence I impose and the reasons I've imposed it.

Does that all make sense so far?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right, good. Are you currently taking any medications, sir?

THE DEFENDANT: No, Your Honor.

THE COURT: All right. Is there anything that you can think of that may interfere with your ability to understand what's happening here today?

THE DEFENDANT: No, Your Honor.

THE COURT: Have you consumed any drugs or alcohol in the last 24 hours?

THE DEFENDANT: No, Your Honor.

THE COURT: And do you authorize Attorney Levine to act and speak on your behalf today?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Thank you, sir. Why don't you have a seat for a moment. We are going to address -- I want to address the plea agreement. As you know, I reserved accepting the plea agreement during the Rule 11 hearing, and I want to address that first because there are a couple of questions I had about it. So let me turn my attention to the Government. I don't know who wants to field those questions as between Mr.

Falk and Mr. Nathans.

So the plea agreement caught my attention for a couple of reasons. The travel of this case was unusual, to say the least. So my memory of the case is that the three defendants that were charged identically with three counts were to be sentenced I think last fall and were to appear over the course of I think two days, consecutive days, to enter pleas of guilty. And Mr. Johnson-Rivera at the very last minute, I think on the day of his anticipated guilty plea, decided that he was not going to plead guilty and rejected the Government's plea deal. And in my experience, especially on the federal side of the street, plea offers from the prosecution typically do not get better with time, so I anticipated that we would be going to trial.

Mr. Johnson-Rivera is represented by a very, very good lawyer and I thought for sure with metaphysical certainty that we would be going to trial, and so January rolled around and motions in limine were fully briefed, although not ruled on, and a jury was selected, and we were on our way to trial in January. And I think about six days before trial an executed plea agreement, the one that we're talking about now, the C plea, was submitted to the Court by the Government, and it was markedly better for Mr. Johnson-Rivera, and good for him, in a couple of different ways.

The plea agreement proposed -- the A portion of the plea

proposed that where he'd uphold his end of the bargain contained in the plea agreement that Counts 1 and 2 would be dismissed and that it would be a binding agreement for ten years, which was good for him on at least two levels. One is it represented about -- not about, it represented one half of the mandatory minimum sentence that his two co-defendants, who were charged identically under the same indictment, are facing who have pled guilty and await sentencing, and I think it was five years less than he was looking at under his original plea agreement.

So typically -- I'm not interested in this particular case because we're the -- the way the guidelines work out there is no real guideline range here, I'm not so interested in talking about the proposed sanction. And I otherwise am not interested in charging decisions that the U.S. Attorney makes because that's none of my business, but in an A plea that can be part of my business if the plea agreement isn't supported by legitimate prosecutorial interests. And I wanted to give the Government an opportunity to expand on the reasons that in the eleventh hour the Government decided to enter into a plea agreement which dispatched with two of the more significant charges under the indictment for one of the defendants, which resulted in this deal.

Mr. Falk or Mr. Nathans?

MR. FALK: Your Honor, as always, excellent

questions --

THE COURT: Were you -- were you looking at each other waiting for -- waiting for the other to.

Mr. Nathans, like Marcus Aurelius, was sitting there stoically and he outlasted you.

MR. FALK: I --

THE COURT: So you're up.

MR. FALK: As I often do, Your Honor, I drew the short straw. So the answer -- look, it's -- it's an excellent question, and it's an appropriate observation from the Court that this plea agreement for this defendant, who is in a lot of ways similarly situated from the other two, is getting better -- better treatment with respect to the outcome here, and the answer is complicated.

What I can tell the Court is that as we were preparing for trial some things became evident to -- to the trial team. One is we -- we really began to feel that the scope of the defendant's culpability was -- was less than his co-defendants.

As we prepared, as we drilled down, as we talked to witnesses, we learned that this defendant had only been in the state for really a matter of weeks, whereas the other two defendants had been here for much, much longer by a factor of 12 or 15. They -- the other two defendants were really the brains of the operation. They really were the driving force with respect to the drug conspiracy, which of course is why

they -- all three of them were here in the first place. The weight that we could attribute to this defendant was really, at the end of the day, we felt negligible in comparison to his co-defendants.

We believe that the co-defendants were the shot callers in this case. We believe that the defendant really was an instrument of the other two who were older, more experienced, and the drivers of the conspiracy. So really for all those evidentiary reasons we felt that a reduced plea would be appropriate.

And there -- you know, frankly, there were other factors at play that I don't want to get into in open court, but needless to say we wouldn't be here today if the Government didn't feel that just on the equities this was an appropriate sanction for the defendant.

He was 19 years old at the time of the conduct. He had no significant criminal history prior to this time. A ten-year sentence for a 19-year-old person is 50 percent again of the rest of their life. He had, as counsel makes plain in his submission to the Court, difficult -- a difficult upbringing with a lot of challenges, and also it's just really a matter of luck that -- that fell in the defendant's favor, while the conduct was extraordinarily troubling by any measure, at the end of the day everybody walked away. So we would be in a very different position if events had been even a little bit

different. But given everything that I've just explained to the Court, we feel that it's appropriate to move forward today.

THE COURT: All right. And I don't want to pry into the other factors that you don't want to get into in open court, but is it -- are you able to represent to the Court that -- part of my concern here, and it relates collaterally to my analysis as -- to this case, is of course there are two other co-defendants who await sentencing. And my concern is, and I would like to be able to extract an affirmation from the Government, that whatever considerations went into the Government's extending this plea offer to Mr. Johnson-Rivera, the stroke of luck, as you put it, that gave him this type of deal, would any of those considerations or vulnerabilities, say, have affected the cases of the other two defendants?

MR. FALK: Your Honor, I can say that whatever challenges we identified in the case would not have -- I -- I firmly believe would not have stood in the way of conviction at trial for either of the other two defendants or for this one.

THE COURT: Okay. All right. There were a suite of circumstances that went into, I take it, giving Mr. Johnson-Rivera the deal he has today, some of which you've told me about, some of which you can't tell me about. I guess what I'm asking you is, the circumstances which you can't tell me about, would those have undermined in any way the cases against the other two defendants?

MR. FALK: Well, in any way is a very broad --

THE COURT: That's why --

MR. FALK: -- is a very broad question.

THE COURT: That's why I put it that way.

MR. FALK: So -- and it requires a careful answer. So -- and that's why I answered you the -- initially the first way. I -- look, there are -- like any case, there are vulnerabilities in this case. However, I would say that there -- I would say that we would prevail at trial. I would say that there would -- there would be -- there would be issues, that -- that -- and that is one of the reasons that we decided there was litigation risk and we didn't want to go forward here. However, my belief is that had we proceeded to trial with this defendant we would have prevailed despite those issues. And had we proceeded with respect to the other two defendants, if they had challenged the facts, we would have prevailed at trial. So that -- that -- that is -- that is my belief standing here today, sir.

THE COURT: All right. So the -- and I -- this is -- I think that we will -- we can move on after this last question, I promise. It is the mere fortuity that Mr. Levine in his eminent wisdom and balanced aggression is the fortuity that he challenged -- he challenged -- he turned down the plea offer, Mr. Johnson-Rivera with his counsel turned down the plea offer, that he is now getting the benefit of not wanting to --

it's the fortuity of him pushing back on that first plea offer, turning it down, that he now got the benefit of this better plea offer because of the vulnerabilities that you identified in the case that the other two defendants are not getting because they decided to go ahead and plead guilty?

MR. FALK: I think that's fair to say.

THE COURT: Okay. Thank you. All right. All right. Great.

Mr. Levine, have you read and discussed with the defendant the revised presentence report?

MR. FALK: Your Honor, if I may.

THE COURT: Oh, yes.

MR. FALK: I just wanted to add for the record.

THE COURT: Yes.

MR. FALK: And just to put a bell on this.

THE COURT: Yes, yes.

MR. FALK: With respect to the other two defendants, notwithstanding the vulnerabilities that we identified in the case after the plea proceedings with this defendant fell apart.

THE COURT: Yep.

MR. FALK: Our offer to the other two defendants would not have changed as a result of the new information that we discovered. And the reason that it wouldn't have changed is because of their culpability relative to this defendant's.

The reason that we felt empowered to -- to make this lower

offer is because in our best estimate, in our best judgment, this defendant's culpability was distinct from the other two defendants. They wouldn't have been in a position to benefit from the types of vulnerabilities that we identified. This defendant was.

THE COURT: Okay. Because of the comparative relative culpability among the co-defendants.

MR. FALK: Precisely.

THE COURT: Got it. Thank you very much. All right. And, oh, I did want to point out, and I don't mean to -- the one thing I wanted to point out, the -- the plea agreement of course had the standard provision that the defendant not engage in any other criminal conduct. Was there an issue -- I saw in the PSR there was an issue about the defendant having maybe perhaps engaged in other criminal conduct. I take it that the Court's not -- Court's not a party to the plea agreement, so I'm not trying to invoke or spoil the plea agreement, I'm just trying to point it out and say that the Government knows that and decided not to spoil the plea agreement.

MR. FALK: That is correct, Your Honor. Those are allegations, as far as I understand it, and we have not yet seen any kind of adjudication with respect to that conduct. And we really know what the Court knows about it at this time, and so the feeling was we're going to get to the end of this proceeding and then he'll have to face the music with respect

to those factors.

THE COURT: Understood. Thank you. Thank you, Mr. Falk. All right. All right, very good, I'm going to accept the plea agreement.

Mr. Levine, have you read and discussed with the defendant the revised presentence report?

MR. LEVINE: I have, Your Honor.

THE COURT: Are you satisfied he understands that report?

MR. LEVINE: I am.

THE COURT: And no objections to the report?

MR. LEVINE: None.

THE COURT: All right.

MR. LEVINE: I -- I would point out --

THE COURT: Yes.

MR. LEVINE: -- he was actually 18 when this happened. He had just turned 18, not 19.

THE COURT: Okay, thank you.

MR. LEVINE: Sure.

THE COURT: Mr. Johnson-Rivera, have you read the revised presentence report, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Mr. Levine tells me he thinks you understand it. Do you think you understand it?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did you have enough time to discuss it with Mr. Levine?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did he answer all of your questions to your satisfaction?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Very good. All right. You can have a seat.

I'll hear from the Government regarding a sentencing recommendation. I think I know what it is.

MR. FALK: Thank you, Your Honor. Before I get there, Your Honor, I just have one -- one item I wanted to point out with respect to the PSR.

THE COURT: Go ahead.

MR. FALK: Paragraph 17, the last sentence, where it was learned that a person fired one shot toward the defendants during the interaction on February 9. We believe that that is erroneous, and we would ask that it be either disregarded by the Court or struck from the PSR.

THE COURT: I'll disregard it, thank you.

Mr. Levine, any objection to that?

MR. LEVINE: None.

THE COURT: Thank you, I'll disregard it.

MR. FALK: With respect to sentencing, we're recommending a ten-year sentence, Your Honor, for the reasons

that are articulated in part to the Court under questioning earlier.

I would just say, before I sit down, that I just want to really hammer on this for the defendant's benefit that he is extremely lucky today, extremely lucky. This could have gone very differently for him in a variety of different ways starting with the conduct itself. Incredibly dangerous antisocial behavior. A drive-by shooting in downtown Saco in the middle of the day. I mean, practically unheard of in the state. One of the first times that I'm aware of that the drive-by shooting statute has been used in the state. This is just brand new stuff for Maine.

And I want to assure the Court and anybody who can hear my voice that the Government takes this extremely seriously. That's why a ten-year sanction is being imposed today, because of the seriousness of the conduct. And ten years may not sound like a lot to some people, but, Your Honor, you and I know that ten years is a lifetime for -- for -- for many people and especially for somebody as young as the defendant. And it is really my sincere hope that the defendant takes this opportunity that he has lucked into and uses his ten years to really turn himself around and to come back out into the community and be a positive source for -- for change in the society and not to continue this devastatingly antisocial behavior that leads nowhere but a -- but a -- but a horrible

place, so -- so -- and I'll sit down, Your Honor, thank you.

THE COURT: Thank you, Mr. Falk, appreciate it.

Mr. Levine.

MR. LEVINE: Thank you, Your Honor. So, Judge, I sent in my sentencing memo, and you know that we support the ten-year sentence. I think it's appropriate under the circumstances. And I don't disagree with the Government's assessment of this behavior as antisocial. What I do want you to know, however, is that in my interactions with Jason over the last year and a half since he has been in Maine, and two and a half years since he was taken into custody in Massachusetts, a little over two years ago, April of 2024, he has been anything but antisocial. He has been at times, you know, upset but never outrageously angry or impulsive.

And -- and what I got to observe when I met with him via Zoom, because he was in various county jails throughout the state of Maine and -- and I could connect with him by Zoom and I could actually allow his mother to participate in some of the, you know, discussions, because as I mentioned to you he was only 18 when this happened and right out of juvie and living with his mother and doing home tutoring, and she was perhaps the biggest, best influence in his life. And she participated in these sessions, and occasionally some of his nieces and nephews who live with his mother would participate, or at least, you know, show up on the screen, and you could see

this guy's face just light up when he saw his younger nieces and nephews.

And -- and I look at things like that and I think to myself, this is not an antisocial personality, this is not a gang banger. This is a young kid who's obviously gone in the wrong direction and ended up in a very dark place, is very lucky to have survived his early life, you know, since -- I think he was 12 years old when he started his series of juvenile detentions, but he still has tremendous potential.

And I say that not just because, you know, I observe his, you know, personality and his demeanor and the love in his heart that he has for his family, including his mom whom he refers to as the best mom in the world, and you don't hear that very often at sentencing because typically people who end up at sentencing haven't had the best parental influence. This is a guy who appreciates his family and you -- you can see them behind me. Not only is his mom here, his two sisters are here, his father is here, his stepmother is here. They've shown up in force because they love this guy.

I told him that I read one of his sister's letters about the sand shark that they got and he turned around and he says, I can't believe you told them that story, but you can see how he interacts with his family. He is a fun-loving, openhearted guy who fell under the influence of some, you know, bad influences and ended up here in Maine trying to just get away

from it all and then ended up getting into it all.

He read to me this morning a letter that he is going to read to you, and he wrote it over the series of about two months while he was in custody at Skowhegan. And I said to him, did anyone help you with that? That's one of the best letters I think I've ever heard. And he said, my tutor at the -- at the jail helped me, her name is Cassidy. And I asked him how she helped him, and then he started to describe their tutoring, and he said, you know, after we were done tutoring, you know, she wasn't very good at math and I'm very good at math so I would start to help some of the other prisoners with their math and they'd let me stay around to do tutoring. And you'll read or you'll hear, when he reads this letter, how one of his goals is to help other at-risk youth. And I've often said, and I think you've even observed, that, you know, helping others is one of the ways you help yourself.

I remember a client of mine that was involved in AA and we were championing the virtues of AA and how it's unscientific yet it works, right, and I think that's what's working for him.

He does have the desire to help others. He does want to get better. His mom talked about his interest in architecture. He told me that some day he wants to be a real estate agent. It's a laudable goal. His criminal history is going to stand in the way, but it's not impossible. I believe in him. I believe in his potential. I believe he will make the most of

his time in prison and he will find a way.

I would like him to be able to speak to you, and then I would like to make some closing remarks.

THE COURT: Thank you. Sir, as a defendant before the Court you have the right to address the Court if you wish. You're not obligated to say anything if you don't want to, but Mr. Levine tells me you would like to say something. So if you would like to do that I'll be happy to listen to you right now.

THE DEFENDANT: Yes, Your Honor. I stand before the Court today taking full responsibility for my actions. I want to sincerely apologize to the Court for the time, resources, and attention my conduct has required. I understand the seriousness --

THE COURT: Hold on. Hold on.

MR. LEVINE: Slow down.

THE COURT: Slow down. Two things are happening right now. Two things are happening right now. See this nice woman right here, her fingers can move way faster than mine but maybe not as fast as you're talking, and, and my old ears can't hear you so.

THE DEFENDANT: All right.

THE COURT: So, slow down. Slow down and let me hear you, okay.

THE DEFENDANT: Restart?

THE COURT: Yeah, restart, start from the top.

THE DEFENDANT: I stand before the Court today taking full responsibility for my actions. I would like to sincerely apologize to the Court for the time, resources, and attention my conduct has required. I understand the seriousness of this matter and I do not take these proceedings lightly. I know my actions have consequences, and I accept accountability for the choices that brought me here.

While reflecting on my life and my mistakes, I have come to recognize how much change is needed within myself. I have spent a great deal of time thinking about the direction my life has taken and the type of man I truly want to become. For much of my life I struggled with instability, poor choices, and destructive habits that began at a young age. Growing up without a father figure and becoming involved in gangs and drugs drove me to a unhealthy environment that shaped many of my decisions. Although those circumstances do not excuse my conduct, they are part of the reality I have to confront and overcome.

Throughout my life I have experienced both successes and failures, but too often I allowed myself to return to familiar patterns and relationships that held me back. I repeatedly fell into old habits that ultimately cost me my freedom and opportunities to build a better future. Looking back now I realize that I took many things for granted, including the opportunities I had to change my life before incarceration.

Since being incarcerated I have spent significant time reflecting on my past, my decisions, and the kind of future I hope to create. For the first time in a long time I have begun to genuinely appreciate the value of stability, consistency, and purpose. I no longer want to live a life controlled by poor choices and destructive influences. I want to become a productive, dependable, and positive member of society. I have developed ambitions to give back to others, particularly at-risk youth who may be struggling with the same hardships and influences that affected me growing up. I hope to participate in programs during my sentencing that will allow me to continue to improve myself and eventually use my experiences to help me guide younger people away from the mistakes I made. If I could prevent even one young person from following the path I chose, then I believe my experience can serve some meaningful purpose.

I understand that words alone are not enough, and I know that the real change must be demonstrated throughout actions over time. I'm committed to continuing my personal growth, taking advantage of any educational, vocational, or rehabilitative opportunities available to me, and proving through my conduct that I am capable of becoming a better man. Thank you, Your Honor, for your time.

THE COURT: Thank you, sir. Mr. Levine.

MR. LEVINE: Thank you. I just want to turn around and --

THE COURT: Yep.

MR. LEVINE: -- acknowledge his family --

THE COURT: Please.

MR. LEVINE: -- and ask if there is anyone who would like to speak. Any of you guys want to speak?

MS. BRETAL: Yes.

MR. LEVINE: Stand up.

THE COURT: Come on up.

MS. BRETAL: Can I read the letter?

MR. LEVINE: What's that?

MS. BRETAL: Can I read the letter?

MR. LEVINE: I think he has read the letter, but why don't you just come on up. Come with me.

MS. BRETAL: All right.

MR. LEVINE: Judge, this is Shayna Bretal, Jason's mom. She wrote you a letter. I think I just want you to expand on that, talk to the judge about what you want for your son.

THE COURT: Take your time.

MS. BRETAL: I never wanted to see him in this position. I'm glad he considers me a great mom. He has got a great support team overall, and I know that he is going to take this and he is going to reflect on it and become a better person. And I know that it's hard to judge somebody when all you're looking at is black and white paper, but he is not

what's on that paper, at least to us. I know that he'll be able to be good and become better and strive to be a better person.

He knows I love him and he knows that I also require him to, you know, do -- if you do something wrong, you have to pay the consequence. There is always consequences to your actions. So he knows how much it makes me angry when he gets in trouble and he doesn't do what he is supposed to do, but he knows that as a family as a whole we're going to stick by his side, we're always going to be here for him despite anything that ever transpires. And I pray to God that this never happens again, and I hope that when this sentence is over that he can come back and stand in front of anybody and say I actually did this and I was able to turn my life around.

THE COURT: Thank you.

MS. BRETAL: Thank you.

MR. LEVINE: I think that's all we have to say. You know, it strikes me that this is really a prayer, right. A prayer for a better life. A prayer for, you know, relief from this lifestyle.

I think, you know, if I'm Jason Johnson-Rivera and I see my mom in tears before the Court talking about how she loves me yet I have to take consequences, I'm going to take consequences. I'm going to do what it takes to make her proud of me. I believe that that's his motivation, so I believe this

is an appropriate sentence.

THE COURT: Thank you, Mr. Levine.

Anything else from the Government?

MR. FALK: No, thank you, Your Honor.

THE COURT: Thank you. All right. I've reviewed the revised presentence report, and I adopt it in its entirety as constituting my findings. And because this was a conviction under 18 U.S.C. 924(c) and no other statute, the guideline sentence is the term of imprisonment required by statute, there is no guidelines calculation. Term of imprisonment is ten years. Supervised release of not more than five years.

Any objections to those findings from the Government?

MR. FALK: No, Your Honor.

THE COURT: Mr. Levine?

MR. LEVINE: No, Your Honor.

THE COURT: Thank you. So, Mr. Johnson-Rivera, I've reviewed the revised presentence report and I take the contents of that report into account, I've considered what I've heard from both of the lawyers today, and I've considered the statements that have been submitted to the Court, and I've considered the statements made in court by you and your mother today.

In determining sentence I have to consider what the guidelines have to say, and I also have to consider what the sentencing factors under a federal statute have to say, and I

have done all of that.

So you've pled guilty to Count 3 of the superceding indictment to use of a firearm during and in relation to a drug trafficking crime. So let me just make a couple of remarks to you. So this is my turn. You've got to hear the lawyers talk for a while, I'm just going to be very brief, but I'm going to try to talk directly to you for a minute, okay.

THE DEFENDANT: Yes.

THE COURT: And what I would like to say about the nature and circumstance of the offense I think is important for this reason. I -- I start here because I -- it's not because I want to embarrass you or shame you in any particular way, but I think what you're learning is an important lesson for a young man especially, which is if you're going to keep the promise to your mom and to the rest of your family it's important, chief among all the promises that you're making, to be brutally honest about everything, but be insightful about what brought you here. Because if you start trying to skim coat over what brought you here, that's going to lead you to start telling progressively bigger lies, which is going to undermine the progress that you're making. And before you know it you'll undo all of the promises that you've made to your family sitting behind you and you'll be in another room just like this, and nobody in this room wants to see that happen. Does that make sense?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. So, you heard Mr. Falk summarize for just a minute how badly this could have gone for you and as a young man -- and I can testify to this because believe it or not I was a young man once upon a time -- the -- one of the primary reasons that they send -- in addition to being much more fit than I am now, but when I was 18 the reason they send young men to war is they have a sense of being immortal. They have a sense of the world that extends not much more than a foot around them. And that's good for war; it's not good for having a perspective on a long life and compassion for other people around them, and sometimes it can lead to antisocial behavior unless that type of savage instinct is restrained through the discipline.

And when I was reading about your case I thought that seems like exactly what happened here because when I was reading about you in your PSR, and when I was reading about you through all the statements that were submitted to the Court, and when Mr. Levine submitted his sentencing memo to me, that didn't sound at all like the guy that was banging it out in broad daylight in Saco, and so how to reconcile those two things.

And I think what you're going to have to come to grips with is that you've been given an unbelievable gift here, and at 19 you're going to have to really come to a serious

realization at how big a gift this was. No matter how long or short the sentence I impose today was going to be, this was a gift, because that could have ended really badly.

Your family sitting behind you could be standing over a grave right now, forget about being in a federal courtroom being sentenced. Or, rather than firing off errant rounds that went nowhere but to terrorize the people just trying to get their kids to school or get themselves to work to pay their mortgages in a place, as Mr. Falk correctly pointed out, that's not too accustomed to drive-by shootings during broad daylight or at any other time of the day, one of those rounds could have gone through the head or the chest of a passerby and you would be looking at 25 to life in state -- in a state courtroom right now. This could have ended in a variety of different, much more bleak ways than your story is starting right now is how I would look at it, if I were you.

So, I say that in -- in hopes, I don't have any illusion that you're going to remember too much of what I say when you leave here, but I'm hoping that something has stick and that you will remember something, and I hope that you appreciate the fact that when we sit here and sentence people in this courtroom very often the case, and Mr. Levine will tell you this, defendants sit in this courtroom, in this courtroom but for the players here that are here because we get paid to be here, the defendant has absolutely no one sitting behind them,

so you have that going for you. You have a support network that's sitting behind you supporting you now. That's an enormous advantage.

The other thing I think you should keep in mind is as a young person you have a lot of runway ahead of you. A lot of runway ahead of you. I would take full advantage of that.

It sounds like to me you are a smart guy. It sounds like to me you're a compassionate guy that has his mind trained on the important things in life, chief among them family. You should lean on them.

If I could offer you a piece of advice, especially as a young person, you should bear the most amount of responsibility that you're able to bear and you should bear that amount of responsibility. You are going to find that when you start doing that life is going to immediately get 1,000 percent better in 1,000 ways.

Tough guys do not bang it out with handguns and coke in the middle of Saco in the middle of the day. That's not what tough guys do. And no matter how bad you think it is right now, you are never out of the fight. You are never out of the fight. So start doing the next right thing right now and for whatever period of time that you're inside do the next right thing. And what does that look like right now? For a while it's going to be baby steps. It's going to be baby steps. So you don't have to think grandly about it.

So what does that mean? That means when you get transported back to the jail, be courteous to the guys that are transporting you back to the jail. When you get back to the jail, don't be a knucklehead and think that you're going to find, you know, encouragement and guidance from the knuckleheads that want to make you a bigger knucklehead while you're inside the jail. Do the next right thing.

A truck pulls straightest when it's under a heavy load. Look for ways to help. Enroll in every program that you can enroll in. This is the time to do it. This is not a dress rehearsal. You are a young man. You need to start taking seriously the fact that if you don't start taking your responsibility seriously you're going to be back in another courtroom like this, if you're lucky, and you're going to be going away for the rest of your life. And if you don't think that that happens, and I know that you know people that that's happened to, they come back here over and over and over again on the installment plan. And it's not only a soul-crushing experience for them, you -- all those people sitting behind you? It destroys their life by watching it and witnessing it as you go through it. So keep those things in mind.

And understand that every -- notwithstanding the fact that nobody in this state wants to see, you know, the Gangster Disciples or any other gang banging it out like, you know, a rental version of the movie Heat in any of our towns in this

state. We want to see the best for you. We want to see the best for you. So take some encouragement by that, but you do that by bearing responsibility. Bear responsibility.

All right. I'm going to -- before I impose sentence, Mr. Falk, have I addressed all of your contentions regarding sentence?

MR. FALK: Yes, Your Honor, thank you.

THE COURT: Thank you. Mr. Levine?

MR. LEVINE: Yes, Your Honor.

THE COURT: Thank you. Sir, if you would stand for sentencing.

Based on all of these considerations I conclude that a proper and fair sentence is as follows: Defendant is committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of ten years. Upon release from imprisonment, defendant will be on supervised release for a total term of four years.

No objections to the conditions of supervised release?

MR. LEVINE: None, Your Honor.

THE COURT: Waive reading?

MR. LEVINE: What's that?

THE COURT: Waive reading of the conditions?

MR. LEVINE: Yes.

THE COURT: I find the defendant does not have the ability to pay a fine, I'm waiving fine in the case. A hundred

dollar assessment.

Let me review with you, sir, your right to appeal. If you feel you have a basis to appeal, what you have to do is to file with the clerk of court within 14 days of today a written notice of appeal. If you fail to timely file a written notice of appeal, you'll have given up that right. And if you can't afford to file an appeal, you can appeal without cost to you. Upon your request, the clerk will immediately prepare -- prepare and file a notice of appeal on your behalf. I will enter a final order of forfeiture today regarding the Smith & Wesson nine-millimeter.

And Government moves to dismiss the remaining counts of the superceding indictment, Counts 1 and 2?

MR. FALK: As to this defendant, yes, Your Honor.

THE COURT: Counts 1 and 2 are dismissed. All right. Anything else from the Government?

MR. FALK: No, thank you, Your Honor.

THE COURT: All right. Thank you.

Mr. Johnson-Rivera -- yes.

(Discussion off the record.)

THE COURT: Mr. Levine, did you want to move to admit the letters?

MR. LEVINE: Oh, I do want to move to admit, and if I could have one minute just to ask my client --

THE COURT: Of course.

MR. LEVINE: -- an additional question.

MR. FALK: No objection.

THE COURT: They're admitted.

(Counsel conferred with defendant.)

MR. LEVINE: Two additional requests. He would like to do -- be recommended for the RDAP program, Judge, that's No. 1. No. 2, and I think I know the answer to this question but I will ask anyway, he was in state custody in Massachusetts for I want to say it was like nine months, I think it was from like April of 2024 to December of 2024 while we were trying to get him to Maine because he had these, you know, controlling federal charges, but he didn't arrive into federal custody in Maine until December. So there is a period of about eight months that I think he is not entitled to credit for time served even though he was under federal indictment. I don't know if the Court has any authority to order that he be given credit for time served while in Massachusetts, but I thought I would ask.

THE COURT: Okay. I'll recommend the 500-hour residential drug treatment program.

Does the Government wish to be heard on the -- I think Mr. Levine's calculus is correct as far as the answer, but I'll let the Government chime in.

MR. FALK: Yeah, that's right, Your Honor. He was in primary state custody for eight months prior to coming into

federal custody; however, my understanding is that was on a separate offense, and I -- my understanding is that BOP would not include that number in the sentence that Your Honor just imposed.

THE COURT: Yep, that's my understanding as well.

MR. LEVINE: Okay.

THE COURT: Thank you.

MR. LEVINE: Thank you.

THE COURT: Thank you, sir, good luck to you.

THE DEFENDANT: Thank you.

THE COURT: We're in recess.

(Time noted: 9:50 a.m.)

**C E R T I F I C A T I O N**

I, Tammy L. Martell, Registered Merit Reporter, Certified Realtime Reporter, and Official Court Reporter for the United States District Court, District of Maine, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated: July 24, 2026

/s/ Tammy L. Martell

Official Court Reporter